UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

DAMIEN DOUGLAS          )
                        )
v.                      )          1:08-cv-282\1:01-cr-188
                        )          *Judge Edgar*
UNITED STATES OF AMERICA )

**MEMORANDUM**

Damien Douglas ("Douglas") has filed a motion to vacate, set aside, or correct his sentence

pursuant to 28 U.S.C. § 2255 (Criminal Court File No. 212).[1]  Douglas contends he was denied

effective assistance of counsel in violation of the Sixth Amendment of the United States

Constitution.

The motion, together with the files and record in this case, conclusively show Douglas is

entitled to no relief under 28 U.S.C. § 2255.  For the reasons which follow, the Court has determined

an evidentiary hearing is not necessary and concludes that Douglas' § 2255 motion lacks merit and

will be **DENIED** (Criminal Court File No. 212).

I.      **Non-Dispositive Motions**

Also before the Court are five motions filed by Damien–three requesting to amend his § 2255

motion and two requesting to supplement his response to the government's reply to his § 2255

motion (Criminal Court File Nos. 220, 222, 234, 236, & 237). Initially, the Court observes that the

three motions to amend his § 2255 motion were filed after the expiration of the one year statute of

---

[1]      Each document will be identified by the Court File Number assigned to it in the
underlying criminal case.

limitations for filing a § 2255 motion. Nevertheless, the Court had the government respond to the first two motions to amend. Thus the Court will address them in the analysis below.

In his third motion to amend, Douglas argues that in light of the Sixth Circuit's opinion in *United States v. Almany*, 598 F.3d 238 (6th Cir.), *cert. granted* 131 S.Ct. 637 (2010), his "first § 924(c) sentence must be vacated due to the second § 924(c) being a 'greater' mandatory minimum." (Criminal Court File No. 234). The United States Supreme Court, however, subsequently vacated the Sixth Circuit's opinion in *Almany* and on remand the Sixth Circuit restored the original sentence. *United States v. Almany*, 626 F.3d 901 (6th Cir. 2010). Accordingly, in addition to being **DENIED** because it is time-barred, Douglas' third motion to amend is also futile as the Sixth Circuit opinion he relies upon has been vacated by the United States Supreme Court (Criminal Court File No. 234).

In his motions to supplement, Douglas reargues his response to the government's reply regarding the alleged insufficient evidence as to the Credit Union's federally insured status and adds case citations (Criminal Court File Nos. 236 & 237). No objection has been filed. Accordingly, the motions to supplement are **GRANTED** (Criminal Court File Nos. 236 & 237).

## II. Standard of Review

A sentence in a criminal case must be vacated if the Court makes a finding "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, . . . " 28 U.S.C. § 2255. Thus, "[a] motion brought under § 2255 must allege one of three bases as a threshold standard: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact

2

or law that was so fundamental as to render the entire proceeding invalid." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001), *cert. denied*, 535 U.S. 967.

A motion filed pursuant to 28 U.S.C. § 2255 must consist of something more than legal conclusions unsupported by factual allegations. *United States v. Johnson*, 940 F.Supp. 167, 170 (W.D. Tenn. 1996). To warrant relief under 28 U.S.C. § 2255 because of constitutional error, the error must be one of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted); *Clemmons v. Sowders*, 34 F.3d 352 (6th Cir. 1994). In order to prevail on a § 2255 motion alleging non-constitutional error, a petitioner must show a "fundamental defect in the proceedings which necessarily results in a complete miscarriage of justice or an egregious error violative of due process." *Riggs v. United States*, 209 F.3d 828, 831 (6th Cir.), *cert. denied*, 531 U.S. 884 (2000); *Gall v. United States*, 21 F.3d 107, 109 (6th Cir. 1994).

Under Rule 8 of the Rules Governing Section 2255 Proceedings in the United States District Courts, the Court is to determine after a review of the answer and the record whether an evidentiary hearing is required. If no hearing is required, the district judge is to dispose of the case as justice dictates. The Court finds it is not necessary to hold an evidentiary hearing.

## III.    Procedural Background

A superseding indictment was filed on December 19, 2001, alleging a conspiracy to commit the robberies alleged in the original indictments filed under criminal case numbers 1:01-cr-186; 1:01-cr-187, and 1:01-cr-188. Upon motion of the government, which was opposed by Douglas, the Court granted the government's motion finding "[t]he government has filed a superseding indictment which, in effect, has consolidated all of the defendants and all of the charges into one case. In the

interest of efficiency, all future filings in this case shall be filed in case no. 1:01-cr-188." (Criminal Court File No. 68).

On December 19, 2001, a seven-count superseding indictment was filed (Criminal Court File No. 58). Douglas was named in the first five counts. Count One charged that in or about early March 2001 and continuing until about April 27, 2001, Douglas and Dameyon Stamper ("Stamper"), Lorenzo Suttles ("Suttles"), and coconspirators Timothy Douglas ("T. Douglass"), Bryce Gilbert ("Gilbert"), and Corey Young ("Young"), named in the Superseding Indictment as unindicted coconspirators, and other known and unknown to the grand jury, conspired to rob the Memorial Hospital Employees Credit Union and the Allied Printers/IBEW 846 Papermill Employees Credit Union by the use of a dangerous weapon [18 U.S.C. § 2113 (a) & (d)] and conspired to rob a Taco Bell restaurant by means of actual and threatened force and violence [18 U.S.C. § 1915], all in violation of 18 U.S.C. § 371.

Count Two charged that Stamper and Douglas, aided and abetted by each other and coconspirators T. Douglas and Young, and others known and unknown to the grand jury, robbed the Memorial Hospital Employees Credit Union in Chattanooga, Tennessee by the use of a dangerous weapon, in violation of 18 U.S.C. §§ 2113(a) & (d) and 2(a) & (b) (Criminal Court File No. 58, Superseding Indictment).

Count Three of the superseding indictment charged that Stamper and Douglas, aided and abetted by each other and coconspirators Douglas and Young, and others known and unknown to the grand jury, used, by brandishing, a firearm during and in relation to the crime of violence charged in Count Two of the Superseding Indictment, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2(a) & (b).

4

Count Four charged that on or about April 2, 2001, Suttles and Douglas, aided and abetted by each other and Gilbert, and others known and unknown to the grand jury, affected interstate commerce and the movement of articles and commodities in such commerce by robbing a Taco Bell Restaurant in Chattanooga, Tennessee by the means of actual and threatened force and violence, in violation of 18 U.S.C. § 2(a) and (b) and 1951.

Count Five charges that on or about April 2, 2001, Suttles and Douglas, aided and abetted by each other and Gilbert, and others known and unknown to the grand jury, used, by brandishing, a semi-automatic pistol during and in relation to the crime of violence charged in Court Four of the Superseding Indictment, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2(a) &(b).

Following a jury trial, Douglas was convicted on all five counts (Criminal Court File No. 133, Verdict Form). Douglas was sentenced in the United States District Court for the Eastern District of Tennessee at Chattanooga on November 18, 2002, to a total sentence of 454 months, i.e., concurrent terms of 60 months on the conspiracy conviction and 70 months on each of the robbery convictions consecutive to the statutory mandatory minimum consecutive sentences of 84 and 300 months on the § 924(c) convictions, for a total sentence of 454 months (Criminal Court File Nos. 150, 152).

On June 7, 2004, the Sixth Circuit affirmed Douglas' convictions and sentence (Criminal Court File No. 166). On January 24, 2005, Douglas' sentence was vacated by the Supreme Court in light of *United States v. Booker*, 543 U.S. 220 (2005). *Douglas v. United States*, 543 U.S. 1109 (2005). On June 23, 2005, the Sixth Circuit remanded the case for resentencing (Criminal Court File No. 172).

5

On March 27, 2006, the Court reconsidered Douglas' sentence under the no-advisory Guidelines and other relevant factors in 18 U.S.C. § 3553(a). The Court selected the same sentence it previously had imposed and the sentence was affirmed on direct appeal on March 14, 2008 (Criminal Court File No. 209). Douglas timely filed the instant § 2255 motion on November 26, 2008 (Criminal Court File No. 212)

## IV.  Factual Background

The facts underlying Douglas' offense conduct are taken from different portions of the Court of Appeals for the Sixth Circuit opinion affirming Douglas' conviction and sentencing (Criminal Court File No. 166):

> Between early March 2001 and April 2001 a group of men carried out several armed robberies in the Chattanooga, Tennessee area. On March 15, 2001, two masked men, later determined to be Corey Young and Douglas, entered the Memorial Hospital Employees Credit Union ("Hospital Credit Union") in Chattanooga, Tennessee. Douglas kept watch at the door while Young, at gunpoint, demanded money from a teller. They made off with $3,565 in U.S. currency. They escaped in a getaway car driven by codefendant Timothy Douglas ("T. Douglas").
>
> On April 2, 2001, two men, Suttles and codefendant Bryce Gilbert, entered a Taco Bell restaurant in Red Bank, Tennessee just prior to closing time. They first hid in the men's room and then in a storage closet, where they hid for approximately forty-five minutes until the restaurant lobby and drive-thru were closed. At that point they emerged from hiding. Suttles brandished a nine millimeter pistol. Gilbert bound the employees' and manager's hands and feet with duct tape. Suttles took the cash that the employees were counting and also money from persons of the employees, all of which totaled approximately $1,300.00. Suttles smashed the surveillance camera tape before he left the store.
>
> . . .
>
> . . . Douglas waited in the getaway car at an apartment behind the restaurant [Taco Bell].

*United States v. Douglas*, 100 Fed. Appx. 449, 451-52,455 (6th Cir. 2004), *vacated*, 543 U.S. 1109 (2005) (The Sixth Circuit reinstated its opinion except for the portions pertaining to sentencing and

remanded the case to this Court for resentencing (Criminal Court File No. 172, Sixth Circuit Order)).

## V. Analysis–Ineffective Assistance of Counsel Claims

Douglas asserts his trial counsel rendered ineffective assistance in six different instances, each of which the Court will analyze separately after discussing the law applicable to ineffective assistance of counsel claims. Thereafter, the Court will analyze the claims raised in the first two motions to amend filed by Douglas.

### A. Applicable Law

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established the criteria for determining whether a Sixth Amendment claim of ineffective assistance of counsel is meritorious. The *Strickland* test requires that a defendant demonstrate two essential elements: (1) counsel's performance was deficient, i.e., counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment; and (2) counsel's deficient performance prejudiced the defense, i.e., deprived the defendant of a fair trial rendering the outcome of the trial unreliable. *Id.* at 687-88; *McQueen v. Scroggy*, 99 F.3d 1302, 1310-11 (6th Cir. 1996); *Sims v. Livesay*, 970 F.2d 1575, 1579-81 (6th Cir. 1992).

In order to demonstrate deficient performance, it must be shown that counsel's representation fell "below an objective standard of reasonableness" in light of the "prevailing professional norms." *Strickland*, 466 U.S. at 686-88. "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *See also West v. Seabold*, 73 F.3d 81, 84 (6th Cir.), *cert. denied*, 518 U.S. 1027 (1996) (internal punctuation and citations omitted). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the

Case 1:01-cr-00188-TRM-CHS   Document 240   Filed 03/30/12   Page 7 of 31   PageID #: 423

[ultimate] judgment." *West v. Seabold*, 73 F.3d at 84.

A reviewing court cannot indulge in hindsight but must instead evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *Strickland*, 466 U.S. at 690; *McQueen*, 99 F.3d at 1311. Trial counsel's tactical decisions are particularly difficult to attack. *McQueen*, 99 F.3d at 1311; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). A defendant's challenge to such decisions must overcome a presumption that the challenged actions might be considered sound trial strategy. *McQueen*, 99 F.3d at 1311; *O'Hara*, 24 F.3d at 828. "[R]eviewing court[s] must remember that 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Wong v. Money*, 142 F.3d 313, 319 (6th Cir. 1998) (quoting *Strickland*, 466 U.S. at 690). A court must make an independent judicial evaluation of counsel's performance and determine whether counsel acted reasonably under all the circumstances. *McQueen*, 99 F.3d at 1311; *O'Hara*, 24 F.3d at 828; *Ward v. United States*, 995 F.2d 1317, 1321-22 (6th Cir. 1993); *Sims v. Livesay*, 970 F.2d 1575, 1580-81 (6th Cir. 1992).

To establish the prejudice prong, a petitioner must show that "counsel's conduct so undermined tthe proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686. The Supreme Court has reiterated the standard of prejudice in *Wiggins v. Smith*, 539 U.S. 510 (2003):

> [T]o establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding
>
> would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Id*. at 534 (quoting *Strickland v. Washington*, 466 U.S. at 694).

8

When applying these standards, the Court is cognizant of the fact that there is a strong presumption counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. "Reviewing courts focus on whether counsel's errors have undermined the reliability of and confidence that the trial was fair and just." *Austin v. Bell*, 126 F.3d 843, 847 (6th Cir. 1997) (citing *Strickland*, 466 U.S. at 687; *United States v. Cronic*, 466 U.S. 648, 658, (1984), *cert. denied*, 523 U.S. 1088 (1998); *McQueen [v. Scroggy]*, 99 F.3d [1302,] 1310-11 [6th Cir. 1996]).

### B. *Ineffective Assistance of Counsel Claims*

Douglas challenges counsel's assistance in six respects: (1) during closing argument–alleging counsel failed to specifically argue he was not guilty of aiding and abetting the Taco Bell robbery; (2) during the Rule 29 motion for acquittal–alleging counsel failed to file a motion for acquittal on the basis the government did not prove Memorial Hospital Credit Union was federally insured; (3) during appeal–alleging counsel failed to contest the sufficiency of the evidence as to the interstate commerce element of the Taco Bell robbery; (4) during jury instructions–alleging counsel failed to object to alleged erroneous Hobbs Act jury instruction; (5) during sentencing–alleging counsel failed to object to the restitution order; and (6) during appeal–alleging counsel failed to appeal the convictions for aiding and abetting the § 924(c) counts.

### 1. *Closing Argument*

Douglas claims he received ineffective assistance of counsel because his trial counsel failed to specifically argue Douglas was not guilty of aiding and abetting the use of the gun in relation to the Taco Bell robbery in violation of § 924(c). This claim is frivolous as counsel's argument that Douglas was not involved in or present at the Taco Bell robbery implicitly included an argument of

9

his innocence in relation to the § 924(c) charge.

To prove aiding and abetting the use of a firearm during a crime of violence under 18 U.S.C.

§ 924(c), the Sixth Circuit has instructed that:

> [T]he government must show that the defendant associated and participated in the use of the firearm in connection with the underlying crime. *United States v. Franklin* 415 F.3d 537, 545 (6th Cir. 2005). 'The government must show that the defendant was a participant rather than merely a knowing spectator, that his presence at the scene of the crime was not surplusage, and that the crime would not have transpired without him.' *Id.* 'This can be satisfied if the accomplice knows that the principal is armed and acts with the intent to assist or influence the commission of the underlying predicate crime.' *Id.*

*United States v. Hintz*, 267 Fed. Appx. 407, 411 (6th Cir. 2008).

The main portion of the government's proof regarding Douglas' participation in the Taco Bell robbery came from the testimony of Gilbert, who was also involved in the robbery. Gilbert testified he committed the Taco Bell robbery with Douglas and Suttles (Criminal Court File No. 144, p. 238). Gilbert testified that on April 2, 2001, he was in the North Highland area when he saw Douglas and Suttles in a gray station wagon which he believed belonged to Suttles. They stopped the vehicle and asked Gilbert what he was doing, and he got in the car with them. When Gilbert got in the vehicle Suttles had a black nine millimeter gun (*Id.* at 240-41). Suttles started talking about how they needed money and robbing the Taco Bell where he had previously worked.

They drove around drinking beer and planning the robbery before they drove over to the Taco Bell. They planned to go inside the Taco Bell and wait in a closet until the restaurant closed for the evening. They had stockings to wear over their heads and Suttles had black gloves.[2] Gilbert was given the duct tape to use on the employees and Suttles had the gun. Douglas's role was to wait

---

[2]    On cross examination Gilbert testified Suttles had the stockings in his possession when they initially picked up Gilbert (Criminal Court File No. 144, p.293).

10

in the car and be the getaway driver if they had to leave in a hurry. They drove past the Taco Bell and parked the vehicle behind the restaurant at some apartments. Gilbert and Suttles left the vehicle and Douglas at the apartments while they walked to the Taco Bell. They initially went into the men's room to wait for the restaurant to close, but eventually went into a closet, where they stayed approximately 45 minutes until the Taco Bell closed.

Once they heard the employees say they had closed, Gilbert and Suttles put the stockings over their head and leaped over the front counter. Suttles, wielding the gun and barking orders to the employees, went to the back office while Gilbert began taping the employees' wrists and ankles. Suttles grabbed the money and stomped the store's video recorder.

They exited out the back of the restaurant and ran to the apartment complex. They removed the extra pair of clothes they were wearing and the stockings, and threw them in the dumpster beside the vehicle. Suttles told Douglas to slide over and Suttles got in the driver's seat, Gilbert was in the back seat, and Douglas was in the front passenger seat as they drove off. They drove to where Gilbert was staying and divided the money. Suttles and Gilbert got the most money since they were the ones who committed the actual robbery. Douglas, however, did get some portion of the money (Criminal Court File No. 144, pp. 241-252).

Federal Bureau of Investigation Agent Jim Melia ("FBI Agent Melia") testified Suttles confessed to the Taco Bell robbery but said Douglas was not involved (Criminal Court File No. 145). Suttles testified during trial that he never confessed to FBI Agent Melia and he was not involved in any of the alleged robberies. One of the employee's working at the Taco Bell on the night it was robbed, however, testified he knew Suttles and recognized the voice of one of the robbers as Suttles' voice (Criminal Court File No. 144, p. 194).

During closing argument, counsel reminded the jury that a ten year old boy, Jarvis Stewart, who observed the Taco Bell robbers at the vehicle as they were leaving, testified there was one tall guy and two guys about 5' 10". Gilbert, who is about the same height as Douglas testified he participated in the Taco Bell robbery, so counsel argued Douglas did not meet the description of one of the shorter guys. To support his argument that Douglas was not involved in this robbery, counsel specifically argued that the jury should believe Suttles' confession exonerating Douglas instead of Gilbert's testimony that Douglas was involved in the Taco Bell robbery. Counsel argued Suttles' confession was more believable, because unlike Gilbert, who was given immunity from prosecution of the Taco Bell robbery, Suttles' received no benefit from the crying confession he made in an effort "to get right with God." During his crying confession to the FBI Agent Melia, Suttles stated Douglas was not involved (Criminal Court File No. 161, pp. 57-58). Counsel further argued their was no corroborating physical evidence of Douglas' participation, and that Douglas was not involved in the Taco Bell robbery at all (Criminal Court File No. 161, pp. 58-50). Such argument translates to the same as arguing Douglas was not guilty of aiding and abetting the use of the gun in the Taco Bell robbery.

Given the facts in this case, Douglas' attorney acted reasonably and effectively in arguing that Douglas was innocent of the robbery charge which implicitly was an argument that he was innocent of aiding and abetting the possession of the gun in the robbery. Counsel's strategy was to assert Douglas' innocence and point out that the United States had not proven Douglas' participation in the Taco Bell robbery beyond a reasonable doubt. Clearly, counsel's closing argument effectively provided Douglas' defense to the Taco Bell robbery and related § 924(c) charge.

If the jury believed Suttles confession to FBI Agent Melia, and had a doubt as to Douglas's

12

participation in the Taco Bell robbery based on the physical description provided by Stewart, then

Douglas would be acquitted of the robbery offense and, necessarily, the related § 924(c) gun charge.

Thus, while counsel did not specifically address the § 924(c) charge related to the Taco Bell robbery,

that tactic was necessary to effectively argue Douglas was actually innocent of the Taco Bell

robbery.  Though Douglas may disagree with counsel's methods, "counsel has wide latitude in

deciding how best to represent a client, and deference to counsel's tactical decisions in his closing

presentation is particularly important because of the broad range of legitimate defense strategy at

that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003).  Therefore, trial counsel's closing

argument met an objectively reasonable level of representation and no § 2255 relief is warranted on

this claim.

      2.      *Failure to Argue There Was No Proof Credit Union was Federally Insured When Arguing Judgment of Acquittal*

Next, Douglas complains counsel was ineffective for failing to file a motion for judgment

of acquittal under Rule 29 of the Federal Rules of Criminal Procedure and argue there was

insufficient evidence to demonstrate the  Memorial Hospital Employees Credit Union was federally

insured on the date of the robbery.[3]  Notably, at the end of the government's proof, counsel did make

---

[3]      Although couched in terms of ineffective assistance of counsel, Petitioner's claim is actually one of insufficiency of the evidence, in that he alleges the facts do not establish one of the essential elements of the offense.  Douglas failed to raise this issue on direct appeal, thus, absent cause and prejudice or actual innocence–neither of which Douglas has established–it cannot be reviewed here.  *Bousley v. Untied States*, 5223 U.S. 614, 619 (1998).  Although the fact of federal insurance is an essential element of the crime, the United States Court of Appeals for the Sixth Circuit has consistently held that "sufficiency of the evidence to support a conviction may not be collaterally reviewed on a Section 2255 proceeding." *United States v. Osborn*, 415 F2d 1021, 1024 (6th Cir. 1969) (*en banc*), *cert. denied*, 396 U.S. 1015 (1970); *United States v.* Shields, 291 F.2d 798, 799 (6th Cir.), *cert. denied*, 368 U.S. 933 (1961); Bradley *v. United States*, 2007 WL 2220421, *2 (E.D. Tenn. 2007) (ineffective assistance of counsel claim is in effect an insufficient evidence claim which is not cognizable in § 2255 proceeding).

a motion for judgment of acquittal, without providing any argument, which the Court denied (Criminal Court File No. 146, p. 586). Douglas contends the government failed to present sufficient evidence that the credit union was federally insured on the date of the Memorial Hospital Credit Union robbery.[4] Douglas argues Ms. Carol Underwood, CEO of the Memorial Hospital Employee Credit Union, did not testify she had any personal knowledge that the credit union was insured at the time of the robbery; that the credit union was, in fact, insured at the time of robbery; that the 1977 insurance certificate was current; or that CUNA actually paid the claim submitted on the proof of loss statement for this robbery.

The government contends that the testimony of Ms. Underwood's that the original certificate that stated the credit union was federally insured, which was the same as the copy that was admitted into evidence with no objection, was sufficient for the jury to find that the credit union was federally insured at the time of the robbery in March 2001. Curiously, the government contends the insurance claim they introduced into evidence, which was filed and prepared by Ms. Underwood as the result of the robbery, was immaterial to the issue of the credit union's federal insurance status. The government asserts it was undisputed that Ms. Underwood, as CEO, had personal knowledge that the credit union was federally insured, although it was not expressly asked. Thus, argues the government, the jury could reasonably infer the federally-insured status existed at the time of the

---

Nevertheless, since Douglas raises this as an ineffective assistance of counsel claim the Court will proceed to analyze the claim as such.

[4]    Douglas raised a sufficiency of the evidence claim on appeal arguing there was insufficient evidence to support his convictions in the Memorial Hospital Credit Union and Taco Bell robbery cases. However, he did not raise the specific claim that the government failed to present sufficient evidence that the credit union was federally insured. *See United States v. Douglas*, 100 Fed.Appx. 449, 454-55 (6th Cir. 2004).

14

robbery.

<em>a..    Sixth Circuit Case Law Regarding the Insurance Status of Financial Institutions</em>

In *United States v. Rowan*, 518 F.2d 685, 693 (6th Cir. 1975), on direct appeal, one of the defendants appealing the case argued there was insufficient evidence to show the bank was federally insured at the time of the robbery. The bank manager had testified the bank was insured on the date of trial but admitted he did not know of his own knowledge that the premiums were paid in January and February of 1974 (the robbery occurred on January 15, 1974). In addition, he brought with him a copy of the FDIC certificate, which hung in his office and which was dated December 1969. Defendant's counsel objected to the introduction of the certificate but the court overruled the objection. The Sixth Circuit concluded that "[c]onstruing the evidence and drawing reasonable inferences in the light most favorable to the Government, we find that the branch was FDIC-insured both in December 1969 and in April 1974. The jury was allowed reasonably to infer therefrom that the branch was FDIC-insured on the day of the robbery." *Id.* at 693.

In *United States v. Wood*, 780 F.2d 555 (6th Cir. 1986) the government presented testimony from the bank's assistant vice president who testified he had been employed in that position for 14 years. He was asked whether he knew if the bank was insured by the Federal Deposit Insurance Corporation ("FDIC") to which it responded "[y]es, it is." *Id.* at 556. When asked how long the bank had been insured he stated the oldest certificate the bank had on file was from 1969. The witness further testified that the FDIC insurance premiums had been paid since at least 1969. On direct appeal, "recogniz[ing] that it is the government's responsibility to prove every necessary element of the offenses charged[,]" *id.* at 557, the Sixth Circuit was troubled by the government's failure to introduce stronger proof of the FDIC-insured status of the bank at the time of the

robberies.  Nevertheless, reasoning that "the Bank officer's testimony that the Bank had on file a 1969 certificate of insurance and that the FDIC insurance premiums had been paid since 1969" and noting "the testimony went uncontradicted at trial and that the Bank officer was not cross-examined on this point[,]" *id.,* the Court concluded the evidence was sufficient to permit a rational trier of fact to find the bank was federally insured beyond a reasonable doubt, "even if it was not as strong and conclusive as it could have been." *Id.*

Subsequent Sixth Circuit case law, however, arguably appears to require the government to introduce stronger proof that the deposits of the financial institutions are federally insured at the time of the robbery.  *See United States v. Sandles,* 469 F.3d 508, 513 (6th Cir.), *cert. denied* (552 U.S. 893 (2007) (Bank employee's testimony she was personally aware bank was federally insured based on seeing the certificates and knowing the bank had been certified for over 23 years was insufficient to establish bank was federally insured).  Finding that the government failed to introduce sufficient evidence at trial that the bank was federally insured and reversing the conviction, the Sixth Circuit explained that although "a witness's unchallenged statement that the bank's deposits are FDIC-insured is sufficient evidence for a jury to find that a bank's deposits are insured by the FDIC[,] *see Wood,* 780 F.2d at 557[,] . . . "'[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.'" *Id.* (citing Fed. R.Evid. 602).  Notably, in *Sandles* defense counsel objected to the lack of foundation demonstrating the employee's personal knowledge.

b.    Discussion

The Court's analysis is guided by the principles "that an error that may justify reversal on

16

direct appeal will not necessarily support a collateral attack on a final judgment[,]" *United States v. Frady*, 456 U.S. 152, 165 (1982), and that in order to obtain collateral relief under § 2255, a petitioner "must clear a significantly higher hurdle than would exist on direct appeal." *Id.* at 167. As noted above, the Court's research has revealed cases requiring a witness to testify, based on their own knowledge, that the financial institution was federally insured on the date it was robbed.

During trial, Ms. Underwood testified she had been employed as CEO for eight years and when asked to identify the Government's Exhibit No. 105, she testified "[t]hat is our federal insurance certificate[,]" which they kept hanging on their wall (Criminal Court File No.144, pp. 69-70).[5] In addition, Ms. Underwood introduced a document and testified it was the insurance proof of loss claim that she prepared and submitted to CUNA Mutual Group Insurance Company as a result of the robbery.[6] The Court instructed the jury that one of the essential elements the government had to prove was "at the time of the robbery, the credit union held accounts insured by the National Credit Union Administration." (Criminal Court File No. 162, p. 18).

The evidence of the credit union's insurance status introduced at trial is sparse and troubling. Because the government's exhibits introduced during trial regarding the credit union's insurance status are not available, the Court is unable to determine exactly what evidence those documents

---

[5] The copy of the certificate submitted by Douglas with his § 2255 motion reflects the insurance certificate was issued on January 14, 1977, which predates the robbery by over twenty years. However, a line at the bottom of the certificate appears to be redacted, and the Court is unable to determine what information was redacted.

[6] "CUNA is an acronym for Credit Union National Association[,]" and it "offers several lines of insurance coverage for both credit unions and the individuals who are members of credit unions." *Louisiana Credit Union League v. U.S.*, 693 F2d. 525, 528 and fn.2 (5th Cir. 1982).

contained. Although the credit union's insurance certificate was introduced and there was testimony it was hanging on the wall at the credit union, there was no testimony that the credit union was insured on the date of the robbery. The testimony as well as an exhibit that a proof of loss insurance claim was filed with CUNA as a result of the robbery permits an inference that the credit union was indeed insured, but it is not definitive proof because, *inter alia*, there is no proof the insurance company paid on the claim. Although one would presume the CEO of a credit union would have personal knowledge of its federal insurance status, there is no testimony in the record to that effect. Therefore, due to the lack of definitive proof that the credit union was federally insured, for purposes of this discussion the Court assumes counsel performed deficiently for failing to request a judgment of acquittal on the basis that the government did not prove that the credit union was federally insured. Nevertheless, the Court disagrees with Douglas' contention that had counsel made such an argument when he made the Rule 29 motion, the court would have been compelled to grant it and Douglas would not have been convicted of that robbery.

Had counsel argued, during his motion for judgment of acquittal, that the government had not proven the federally insured element, and the Court found such an argument viable, undoubtedly the government would have moved to reopen the case and introduce additional evidence, and the Court would have granted that request. *United States v. Hinderman*, 625 F.2d, 994, 996 (10th Cir. 1980) (after a defendant moves under Federal Rule of Criminal Procedure 29 for acquittal, a district judge retains wide discretion to allow the government to reopen its case to correct errors "or some other compelling circumstance . . . justifies a reopening and no substantial prejudice will occur."). In *Hinderman* the defendant moved for judgment of acquittal under Fed.R.Crim.P. 29(a). Before ruling on the motion, the court expressed concern that the government's proof of venue was

deficient. The court then allowed the prosecution to reopen its case to supply the relevant evidence given by a witness the prosecution had used in its case-in-chief and then the court denied the Rule 29 motion. The *Hinderman* court explained:

> Ordinarily, the trial court is vested with wide discretion to permit the reopening of either party's case. *United States v. Keine*, 424 F.2d 39, 40-41 (10th Cir. 1970). We hold that the rule is no different in the specific context presented here. Rule 29(a), as it concerns a motion for acquittal at the close of the prosecution's case, implements the "requirement that the prosecution must establish a prima facie case by its own evidence before the defendant may be put to his defense." *Cephus v. United States*, 324 F.2d 893, 895 (D.C.Cir.1963). Thus, the government's case-in-chief should not be treated as an experiment that can be cured after the defendant has, by motion, identified the failures. But the trial court must be vested with discretion to permit reopening when mere inadvertence or some other compelling circumstance, such as that involved in this case, justifies a reopening and no substantial prejudice will occur. If the court in the exercise of cautious discretion allows the prosecution to reopen its case before the defendant begins its defense, that reopening does not violate either the rules of criminal procedure or the defendant's right not to be put twice in jeopardy. *Accord, United States v. Sisack*, 527 F.2d 917, 919-20 (9th Cir. 1975). *See United States v. Batie*, 457 F.2d 927 (5th Cir. 1972). Here the prosecution's failure to adequately prove venue was clearly inadvertent, and defendant suffered no prejudice or surprise.

*United States v. Hinderman,* 625 F.2d 994, 996 (10th Cir., 1980). Therefore, because the Court would have permitted the government to reopen its proof and because there is no evidence before the Court that the credit union was not federally insured, Douglas is unable to meet the prejudice prong of the *Strickland* test.

Moreover, based on the record before the Court, it appears that even if counsel made such an argument on direct appeal and the Sixth Circuit ruled in his favor, it would have simply resulted in a new trial in which Douglas would have been conviction as there is no evidence the credit union was not federally insured. *See United States v. Sandles*, 469 F.3d 508, 518 (6th Cir. 2007) (remanding case for new trial because government failed to present sufficient evidence that bank was federally insured).

19

To demonstrate prejudice under *Strickland*, Douglas must show "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The Supreme Court further explained that, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* At 695. The Supreme Court has reiterated that the focus when determining prejudice must be on "whether the result of the proceeding was fundamentally unfair or unreliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

"To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Id.* at 369-370. *Lockhart v. Fretwell*, however, does not "justify a departure from a straightforward application of *Strickland* when the ineffectiveness of counsel *does* deprive the defendant of a substantive or procedural right to which the law entitles him." *Williams v. Taylor*, 529 U.S. 362, 393 (2000). Thus, as the Supreme Court has instructed, "the benchmark of an ineffective-assistance of counsel claim is the fairness of the adversary proceeding." *Nix v. Whiteside*, 475 U.S. 157, 175-76 (1986). "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Lockhart v. Fretwell*, 506 U.S. at 372.

Here, Douglas was not deprived of a substantive or procedural right, as he had counsel and he was not denied the right to make a Rule 29 motion for judgment of acquittal. Rather, in this instance, counsel failed to make a particular argument during his request for judgment of acquittal and on direct appeal–an argument which would not have resulted in Douglas' acquittal, but at most may have resulted in a new trial. Consequently, there is nothing before the Court indicating the

adversary proceeding was not fair or reliable, as there is no evidence from which the Court can even

infer that Douglas was convicted of robbing a credit union which was not federally insured

In sum, Douglas has not demonstrated the outcome of the trial was fundamentally unfair or

unreliable, thus he has not demonstrated prejudice under *Strickland* as the result of counsel's alleged

shortcomings and § 2255 relief is not warranted. To grant Douglas relief would result in the

"windfall" which the United States Supreme Court has cautioned against in *Fretwell*. Accordingly,

as Douglas has not shown he suffered any prejudice, his claim that counsel was ineffective for

failing to argue the insurance status of the credit union is without merit.

### 3. Interstate Commerce Claim

In his third ground for relief, Douglas claims counsel was ineffective on appeal for failing

to argue the evidence was insufficient to convict him of the Taco Bell robbery because the

government failed to prove the robbery affected interstate commerce. Douglas is incorrect in his

assertion as the government did sufficiently demonstrate the Taco Bell robbery affected interstate

commerce and the Sixth Circuit so found on direct appeal (Criminal Court File No. 166).

A conviction under he Hobbs Act requires only a showing of a *de minimis* effect on interstate

commerce. *United States v. Smith*, 182 F.3d 452, 456 (6th Cir. 1999). Douglas' co-defendant raised

the issue on appeal and the Sixth Circuit concluded the government presented sufficient evidence

to establish the jurisdictional predicate for the Hobbs Act violation. Specifically, the Sixth Circuit

concluded the testimony–that the co-defendants stole business proceeds from Taco Bell; the total

loss to Taco Bell that night was $1,559; the owner of that Taco Bell was a company located in

Birmingham, Alabama; and that food supplies were brought by truck from Georgia–"easily [met]

the *de minimis* test." (Criminal Court File No. 166, p. 11).

21

Since there is no "constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decide not to present those points[,]"*Jones v. Barnes*, 463 U.S. 745, 751 (1983), there necessarily is no right to have counsel press frivolous issues. The Sixth Circuit's ruling clearly demonstrates the issue was frivolous. Thus, counsel was not deficient, and Douglas was not prejudiced by counsel's failure to argue the evidence was insufficient to established the Taco Bell robbery had the required effect on interstate commerce. Accordingly, Douglas has not met either prong of the *Strickland* test as to this claim and relief is **DENIED**.

### 4. Jury Instruction Claim

In his fourth claim for relief, Douglas contends counsel was ineffective for failing to object to the jury instructions regarding the elements that were required to be proven to demonstrate he committed the Taco Bell robbery. Specifically, Douglas complains that the Court instructed that "[i]f the Taco Bell restaurant sold merchandise that was obtained from outside Tennessee, a robbery of the restaurant would affect interstate commerce." (Criminal Court File No. 162, p. 27). Douglas has not demonstrated that such a charge was an incorrect statement of the law.

The Sixth Circuit has concluded that the interstate commerce element was proven by showing the robbery and that Taco Bell purchased items from out of state and then sold them in Tennessee. The proof demonstrated Douglas was involved in the robbery of Taco Bell who sold items they purchased from out of state and sold them in Tennessee. Consequently, Douglas has not demonstrated the jury instruction was incorrect. Nevertheless, counsel's choice not to object to the instruction is not the sort of egregious error, if it is indeed an error, that would fall outside the "wide range of reasonable professional assistance" guaranteed by the Sixth Amendment. *Strickland*, 466

U.S. at 689. Accordingly, Douglas has failed to demonstrate counsel performed deficiently and that he suffered prejudice by counsel's failure to object to the instructions.

### 5. Restitution Claim

Douglas contends counsel was ineffective for failing to object to the Court's restitution order requiring payment jointly and severally. This claim is frivolous as the Court clearly has the authority and the discretion to award restitution jointly and severally. Title 18 U.S.C. § 3664(h) provides:

> If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

In this case, the Court implemented a payment schedule whereby each defendant, while incarcerated, is to pay fifty percent of UNICOR wages toward restitution or, if not so employed, $25 per quarter (Criminal Court File Nos. 163 & 165 (Suttles' and Douglas' Sentencing Transcripts)). The restitution award is fair and the Court properly exercised its discretion. *United States v. Bogart*, 576 F.3d 565, 575-76 (6th Cir. 2009) (no abuse of discretion in holding the defendants jointly and severally liable for restitution to the victims of the conspiracy). Accordingly, this restitution claim is without merit.

### 6. Failure to Challenge Aiding and Abetting the § 924(c) Offense

Douglas challenges his conviction for aiding and abetting the brandishing of a firearm in relation to the Taco Bell robbery. Douglas contends the only evidence adduced at trial was that he sat in the alleged get-away car, blocks away from Taco Bell while the robbery occurred. Thus, according to Douglas, there was insufficient evidence to convict him on this charge and counsel should have raised it on appeal.

23

Douglas raised a similar argument on direct appeal which the Sixth Circuit rejected. On direct appeal, Douglas claimed the government failed to introduce any scientific evidence or unbiased accomplice testimony against him at trial to support his convictions in the [Hospital Credit Union] and/or Taco Bell robbery cases." (Court File No. 166, p. 7). In addition, on appeal Douglas claimed that since the evidence was insufficient to support those convictions, the related convictions under 18 U.S.C. § 924(c) should be reversed as well. The Sixth Circuit concluded there was sufficient evidence supporting Douglas' involvement in the Taco Bell robbery and denied relief on the robbery and § 924(c) convictions (Court File No. 166, p. 8).

Douglas cannot use a § 2255 motion to relitgate the same issue presented and decided on direct appeal absent exceptional circumstances or an intervening change in the law, neither of which Douglas alleges or proves. *Wright v. United States*, 182 F.3d 458, 467 (6th Cir. 1999). Even assuming this claim was not raised on appeal, Douglas would be entitled to no relief.

The testimony revealed Douglas and Lorenzo Suttles were driving around when they picked up Bryce Gilbert ("Gilbert"). Gilbert got in the car with them and Lorenzo, who had a firearm, started talking about robbing the Taco Bell because they needed some money.[7] The three men began discussing how they would commit the robbery and who would go in. At the last minute Gilbert decided to go in with Lorenzo, who had previously worked at the Taco Bell.(Court File No. 144 pp. 234-44). Once they decided to commit the robbery Lorenzo had the gun and he and Gilbert went inside the Taco Bell while Douglas waited out in the car to be the "driver if [they] needed him to be" (Court File No. 144, p. 244). In addition, there was testimony that Suttles was brandishing the gun during the robbery (Court File No. 144, pp. 247-48).

---

[7]     Gilbert testified Lorenzo had a gun in the car.

Consequently, Douglas' claim is flawed because it is not necessary to find that he personally committed the crime himself. The fact that he intentionally helped or encouraged someone else to commit the crime is sufficient to convict him under an aider and abettor theory. *See United States v. Blood*, 435 F.3d 612, 623 (6th Cir. 2006) ("[T]o aid or abet another to commit a crime, a defendant must in some way associate himself with the venture such that his participation is intended to bring about the crime or make it succeed."); *United States v. Bandy*, 239 F.3d 802, 805 (6th Cir. 2001) ("[A] defendant is liable as an aider and abettor for use of a firearm in relation to a crime of violence when his accomplice uses a firearm in relation to jointly undertaken criminal activity").

Thus, under applicable case law, the evidence was sufficient to support Douglas' conviction for aiding and abetting brandishing a firearm during and in relation to the Taco Bell robbery as he was involved in the planning of the robbery and was ready to drive his cohorts away from the scene of the crime if a quick getaway was necessary. Accordingly, there is insufficient to support the § 924(c) conviction and relief on this claim is **DENIED**.

### 7. *First Motion to Amend*

In his first motion to amend, Douglas claims that on May 2, 2009, he received new exculpatory evidence, in the form of an affidavit from a co-defendant, Dameyon Stamper,[8] demonstrating he is actually innocent of the crime of conviction. Douglas argues that in the affidavit

Stamper recants his testimony and exposes the misconduct of the Assistant United States Attorney prosecuting his case (Criminal Court File No. 220).

The Amended Judgment in this case was affirmed on direct appeal on March 14, 2008

---

[8] Stamper had known Douglas for 15-17 years when he testified (Criminal Court File No. 145, Transcript, p. 405).

(Criminal Court File No. 209). Douglas did not pursue a petition for certiorari in the Supreme Court of the United States.[9] Therefore, the judgment of conviction became final for purposes of § 2255 on June 12, 2008, and the one year statute of limitations for filing a § 2255 motion expired on June 12, 2009. Consequently, Douglas' motion to amend, which he placed in the prison mailbox on June 15, 2009, was filed three days too late. In addition, Rule 15(c) of the Federal Rules of Civil Procedure does not save the claim as the claim does not "relate back" to the "conduct, transaction, or occurrence" relied upon in the claims in the timely-filed § 2255 motion. *Mayle v. Felix,* 545 U.S. 644, 656-67 (2005).

Douglas argues, however, that the affidavit of Dameyon Stamper is newly discovered evidence, thus, the Court discerns he is implicitly contends 28 U.S.C. § 2255(f)(4) applies and the one year period of limitation for his claim runs from "the date on which the facts supporting the claim . . . presented could have been discovered through the exercise of due diligence." According to Douglas, he became aware of these new facts on or about May 2, 2009 (Criminal Court File No. 220). It appears that Dameyon Stamper signed his affidavit on January 6, 2009 (Criminal Court File No. 220-1). Notably, if Dameyon Stamper did indeed commit perjury during Douglas' trial, Douglas knew the factual basis of Stamper's alleged perjury at trial.

Assuming, however, for the sake of discussion that this claim is timely, it offers Douglas no

---

[9] When a defendant pursues a direct appeal but does not petition the United States Supreme Court for certiorari, his judgment becomes final when the time expires for filing a petition for certiorari. *Clay v. United States*, 537 U.S. 522, 532 (2003). A petition for a writ of certiorari to review a judgment is timely when it is filed within 90 days after entry of the judgment. *See* Rule 13 Supreme Court Rules. Rule 13 specifies that "[t]he time to file a petition for a writ of certiorari runs from the date of entry of the judgment or order sought to be reviewed, and not from the issuance date of the mandate[.]"

relief. First, recanting affidavits and witnesses are viewed with "extreme suspicion." *United States v. Chambers*, 944 F.2d 1253, 1264 (6 Cir.1991). This is particularly so in this case as Douglas previously attempted to suborn perjury in his underlying criminal case, for which he received an offense level enhancement for obstruction of justice (Criminal Court File No. 163, Sentencing Transcript, pp. 3-4). Second, Mr. Stamper waited approximately seven years before recanting his trial testimony, which he presented under penalty of perjury. Third, the only portion that arguably amounts to a recantation as to Douglas are the following two sentences: "My reason for writing this deposition is in regards to Damien Douglas and Lorenzo Suttles. I am here attempting to make amends, and correct a wrong I committed in falsely accusing and implicating both Damien and Lorenzo in crimes of which they are both innocent." (Criminal Court File No. 220-1). Stamper does not attempt to explain how he misstated the facts to which he testified or provide any details of how he is now alleging the crime was actually committed.

Therefore, the Court views this alleged recantation with extreme caution. *See Knickerbocker v. Wolfenbarger*, 212 Fed.Appx. 426, 433 (6h Cir. 2007), *cert. denied*, 552 U.S. 896 (2007) (unpublished) ("[T]rial witnesses recanting their testimony are viewed with extreme suspicion"). In addition, the Sixth Circuit has previously held that "[e]ven if accepted, a post-trial recantation is generally not sufficient to grant habeas relief absent constitutional error." *Bower v. Curtis*, 118 Fed.Appx. 901, 908 (^th Cir. 2004).


During trial Stamper testified he committed the Memorial Hospital Credit Union robbery with Douglas and others. Stamper explained that Douglas, Timothy Douglas, and Corey Young were driving in a vehicle when they motioned him to pull over. Timothy Douglas asked him to call

the police and tell them there was a homicide next to Kankeus convenient store to divert the police while they robbed the credit union. He did so, and later Douglas told him that he (Douglas) watched the door during the robbery and as they were leaving he told Corey Young to go back and get some more money, which he did. (Criminal Court File No. 145, pp. 405-11).

During trial Corey Young and Timothy Douglas also testified, corroborating Stamper's trial testimony of Douglas' involvement in the Memorial Hospital Credit Union robbery (Criminal Court File No. 144, Trial Transcript, pp. 21-35; 81-96). Stamper's recanting affidavit has not been corroborated with any other evidence of innocence. Moreover, the affidavit itself is troubling as it fails to give any details or facts, but rather simply states: "I am here attempting to make amends, and correct a wrong I committed in falsely accusing and implicating both Damien and Lorenzo in crimes of which they are both innocent." (Criminal Court File No. 220-1).

Although, Stamper claims he was told by the prosecution to make his statement match and corroborate Corey Young's, Timothy Douglas's, and Bryce Gilbert's statements, those witnesses have not corroborated Stamper's claims. Nevertheless, aside from the fact that Douglas has failed to demonstrate Stamper's recanting affidavit is reliable, even if Stamper's repudiation of his trial testimony was credible, it is insufficient to establish Douglas' actual innocence so as to excuse the limitations period. Stamper's affidavit does not establish Douglas' actual innocence as it does nothing to weaken the testimony of Corey Young and Timothy Douglas, the two co-defendants who were actually with Douglas at the time of the Memorial Hospital Credit Union robbery. Therefore, the Court concludes Stampers' vague recantation is an insufficient basis upon which to grant relief. Accordingly, Douglas' motion to amend is **DENIED** as time-barred, and in the alternative, as futile (Criminal Court File No. 220).

### 8. Second Motion to Amend

In his second motion to amend, Douglas claims that on or about June 28, 2009, he discovered the prosecution withheld exculpatory evidence from him and his attorney in violation of *Brady* i.e, hair evidence from a toboggan. To demonstrate a *Brady* violation, Douglas must show the following three components: (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensured." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Aside from the fact that Douglas has not demonstrated the evidence at issue would have been favorable to him, either because it is exculpatory or impeaching, he is unable to demonstrate the evidence was suppressed. As he states in his motion, Agent Morse testified, although somewhat confusingly, during his detention hearing. After testifying about fingerprint evidence, Agent Morse was asked whether any other scientific evidence was gathered. She responded, "We've got stuff that's still pending. I've got a cap that was found and some hair and what has been returned on that. I have the samples." (Criminal Court File No. 222-1, p. 7). Although it is unclear whether the hair samples were even tested, the fact of the matter is that Douglas was put on notice during his detention hearing that such evidence was available. Consequently, it was not suppressed by the government.

Also noteworthy, is that trial counsel used the lack of test results to Douglas' favor by arguing that if his client had a black toboggan on and pulled it off as Corey Young alleged, there should have been some hair evidence but the government had no hair or any other scientific

evidence linking Douglas to the crime. Therefore, because the defense was notified of the hair evidence prior to trial, it does not qualify as *Brady* material, and Douglas is not entitled to § 2255 relief on his *Brady* claim.

To the extent Douglas is claiming counsel was ineffective for failing to have the hair evidence tested, his claim likewise fails. This is so because he has not overcome the presumption that counsel's decision not to pursue testing of the scientific evidence was sound trial strategy. Considering the other evidence against Douglas, counsel could have strategically decided it was not worth the risk of having the hair evidence come back as belonging to Douglas.

Nevertheless, assuming counsel was ineffective for failing to pursue the testing of the hair, Douglas has not shown he suffered any prejudice. Whether or not the toboggan was the one worn by Douglas was not a significant fact in Corey Young's testimony or in the context of the other evidence demonstrating Douglas' guilt. Even if the hair had been tested and did not belong to Douglas, it would not have exonerated him as it did not weaken the testimony of his co-defendants that they committed the robbery with Douglas. Rather, at most, it would have impeached Corey Young's statement that Douglas' toboggan was the one found in the car. Therefore, the Court concludes that in light of the other evidence from Corey Young and Timothy Douglas and others that Douglas participated in the credit union robbery, there is no reasonable probability that the jury would have acquitted Douglas merely because Young may have mistakenly believed the toboggan belonged to Douglas.

Accordingly, because this is not newly discovered evidence, Douglas' second motion to amend is time- barred, and in the alternative, futile as both the *Brady* claim and ineffective assistance of counsel claim fail.

30

## VI.    Conclusion

Douglas has failed to present any facts which establish his conviction or sentence is subject to collateral attack under 28 U.S.C. § 2255. Douglas is not entitled to any relief under § 2255 and a judgment will enter **DENYING** his motion.


_____/s/ R. Allan Edgar_____
R. ALLAN EDGAR
UNITED STATES DISTRICT JUDGE